# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

TERESA P. BRITTON                                    CASE NO. 3:18-CV-01523

VERSUS                                               JUDGE TERRY A. DOUGHTY

ANDREW SAUL, COMMISSIONER, U.S.                      MAG. JUDGE KAREN L. HAYES
SOCIAL SECURITY ADMINISTRATION

## REPORT & RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice.

## Background & Procedural History

Teresa Britton protectively filed the instant application for Title II Disability Insurance Benefits on January 19, 2016. (Tr. 54, 156-158). She alleged disability as of January 2, 2016, because of head, neck, back, and knee injuries, arthritis, diabetes, and headaches (from the head injury). (Tr. 177, 181). The state agency denied the claims at the initial stage of the administrative process. (Tr. 85-98). Thereafter, Britton requested and received an August 23, 2017, hearing before an Administrative Law Judge ("ALJ"). (Tr. 65-84). However, in a December 5, 2017, written decision, the ALJ determined that Britton was not disabled under the Social Security Act, finding at step four of the sequential evaluation process that she was able to return to her past relevant work as a retail sales clerk. (Tr. 51-61). Britton appealed the adverse decision to the Appeals Council. On September 25, 2018, however, the Appeals Council denied Britton's request for review; thus, the

ALJ's decision became the final decision of the Commissioner.  (Tr. 1-3).[1]

On November 21, 2018, Britton sought review before this court.  She alleges four assignments of error:

1) The ALJ's finding that plaintiff retained the residual functional capacity to stand and walk for six hours a day on a sustained basis is not supported by substantial evidence;

2) The ALJ's reasons for not crediting the opinion of APRN Michael Brown are not supported by substantial evidence;

3) The ALJ failed to properly consider plaintiff's subjective complaints; and

4) The ALJ's finding that plaintiff can return to her past relevant work as a sales clerk is not supported by substantial evidence.

### Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards.  *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).  Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed.  *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards.  *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. at 401. Substantial evidence lies somewhere between a scintilla and a preponderance.  *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).  Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, ___ U.S. ___, 139 S.Ct. 1148, 1154 (2019) (citation and internal quotation marks omitted).

A finding of no substantial evidence is proper when no credible medical findings or evidence

---

[1] The Appeals Council vacated its earlier order dated May 16, 2018, whereby it had dismissed the claimant's request for review on the mistaken basis that it was not timely filed.  *See* Tr. 18-19, 36-40.

support the ALJ's determination.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232 (5th Cir. 1994).

<u>**Determination of Disability**</u>

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423(a)(1)(D).  The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.  *See* 42 U.S.C. § 423(d)(2)(A).  Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

(1)     An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)     An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3)      An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4)     If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

     (5)     If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).  If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987); *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).

## **ALJ's Findings**

## I.     **Steps One, Two, and Three**

     The ALJ determined at step one of the sequential evaluation process that the claimant had not engaged in substantial gainful activity during the relevant period.  (Tr. 56).  At step two, she found that the claimant suffered severe impairments of lumbar and cervical disc disease, osteoarthritis, and diabetes.  (Tr. 56-57).  The ALJ concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.  *Id.*

## II.     **Residual Functional Capacity**

     The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform light work,[2] but that she can only occasionally kneel, stoop, crouch, and crawl, but never

---

2  Light work entails:

     . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must

climb ramps, stairs, ladders, ropes, or scaffolds.  (Tr. 57-60).

## III.    Step Four

At step four, with the assistance of a vocational expert, the ALJ, determined that the claimant was able to return to her past relevant work as a retail sales clerk -- light, Dictionary of Occupational Titles ("DOT") Code # 279.357-054, both as she actually performed that job, and as the work is performed generally in the national economy.  (Tr. 60, 82).[3]

## <u>Analysis</u>

## I.    RFC

a)  <u>Non-Exhaustive Chronology of Relevant Medical Evidence</u>

Britton went to the emergency room on September 11, 2015, after she hit the right side of her head on a metal pole at work.  (Tr. 240-243).  She complained of headache and head contusion.  *Id.* She received a prescription for Ultram and was discharged.  *Id.*

On November 12, 2015, plaintiff saw Michael Ehrlich, M.D., for her chronic headaches that were precipitated by exercise.  (Tr. 255-259, 479-483).  The headaches occurred daily upon awakening since September 11, 2015, when she hit her head at work.  *Id.*  The headaches lasted for a few hours at a time.  *Id.*  A CAT scan of the head was normal.  *Id.*  Ehrlich diagnosed  post-concussion syndrome, and cervicalgia.  *Id.*  He stated that she could continue working.  *Id.*

Britton received physical therapy from December 10, 2015, until January 15, 2016.  (Tr. 246-

---

have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

[3] Past relevant work is defined as "the actual demands of past work or 'the functional demands . . . of the occupation as generally required by employers throughout the national economy.'"  *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987) (citing, Social Security Ruling 82-61).

248).  She complained of increased pain with all functional movements that was a seven out of ten (7/10) at its worst.  *Id.*

A December 14, 2015, MRI of the cervical spine showed severe arthritis, but nothing surgical.  (Tr. 264, 519-520).  An MRI of the brain was negative.  (Tr. 264, 521-522).

On December 18, 2015, Britton returned to Dr. Ehrlich for follow-up.  (Tr. 260-263, 473-476).  She reported moderate headaches every day.  *Id.*

On January 13, 2016, nurse practitioner ("NP") Michael Brown released Britton to return to work with no lifting, but she needed crutches to walk and stand.  (Tr. 250).  She was diagnosed with back pain/strain and knee pain.  *Id*.

On January 15, 2016, plaintiff returned to Dr. Ehrlich for follow-up of her headache, plus back and right knee pain.  (Tr. 265-268, 347-350, 507-510).  She reported experiencing about 20 headaches since her last visit.  *Id.*  In addition, she had suffered a second work-related injury on January 2, 2016, when she tripped and fell over a wire cover on the floor, landing on her right knee and injuring her knee and back.  *Id.*  She saw a nurse practitioner who placed her on steroids and naproxen.  *Id.*  She still was having right knee and back pain, plus headaches.  *Id.*  Ehrlich diagnosed post-concussion syndrome, and stated that she was unable to work.  *Id.*

A January 15, 2016, note written on Dr. Ehrlich's prescription pad stated that Britton was off work until further notice, secondary to her concussion and right knee injury.  (Tr. 252).

On January 20, 2016, NP Brown released Britton to return to work with no lifting, carrying, pushing/pulling, crutches for walking and standing, and with the possible need for several breaks. (Tr. 249).

On February 17, 2016, plaintiff returned to Dr. Ehrlich for follow-up for headache.  (Tr. 366-370, 501-505).  Britton continued to have headaches numerous times per month from post-concussion syndrome for a work-related injury with a normal MRI of the brain. *Id.*  Her second work injury was a trip and fall that injured her right knee.  *Id.*  She was walking with a cane and seeing Dr.

Brown.  *Id.*  She was able to work with her headaches from her first injury, but not working since the second accident.  *Id.*  Ehrlich indicated that she was unable to work.  *Id.*

A March 23, 2016, MRI of the right knee showed moderate chondromalacia patella, mild-moderate patella tendinosis, and early chondromalacia within the lateral tibial plateau.  (Tr. 371).  A March 23, 2016, MRI of the lumbar spine showed mild spondylosis of the L2-S1 levels, slight annular bulging or protrusion, but no impressive herniation or stenosis and nothing surgical.  (Tr. 372, 518, 435).

On March 30, 2016, plaintiff returned to Dr. Ehrlich for follow-up for headaches caused by her head injury.  (Tr. 362-365, 497-500).  Britton reported that she still was experiencing headaches, but they were not as frequent.  *Id.*  She was off work because of headaches, back pain, and right knee pain.  *Id.*  She had an abnormal MRI of the lumbar spine and the right knee.  *Id.*  However, her headaches had improved markedly.  *Id.*  She had an orthopedic gait ambulating with a cane because of her right knee pain.  *Id.*  Ehrlich diagnosed headache, orthopedic disorders of the spine, and backache.  *Id.*  He stated that Britton was unable to work.  *Id.*

On April 16, 2016, plaintiff was seen by consultative physician, Dr. William Varnado, at the request of the state agency for purposes of disability evaluation.  (Tr. 315-322).  Britton reported that she used a walker to ambulate and was able to walk a very short distance on level ground.  *Id.*  She had difficulty:  standing for 0-5 minutes, lifting more than 5-10 pounds with the right arm, and lifting more than 0-5 pounds with the left arm.  *Id.*  She could only sweep and mop for up to five minutes at a time.  *Id.*  She stated that she was unable to cook, wash dishes, or grocery shop.  *Id.*  Britton used a cane, but was able to get up and out of the chair without difficulty.  *Id.*  However, she experienced difficulty mounting/dismounting the examination table.  *Id.*  She ambulated with difficulty and used an assistive device, which appeared to be helpful, but not medically required.  *Id.*  She could squat to the floor and recover.  *Id.*  However, she had difficulty bending over and touching her toes.  *Id.*  Her grip strength was normal bilaterally.  *Id.*  Fine and gross manipulation were normal.  *Id.*  There was

7

no evidence of muscular atrophy.  *Id.*  Motor strength was 5/5 in all extremities.  *Id.*  Range of motion was normal, with no joint deformities noted.  *Id.*  Varnado diagnosed head injury, neck injury, arthritis, back and knee injury, diabetes, and headaches due to head injury.  *Id.*  He limited plaintiff to lifting and carrying on a continuous basis on the right side, i.e., more than 2/3 of an eight-hour day.  *Id.*  She also ambulated with difficulty and used an assistive device, which appeared to be helpful, but not required.  *Id.*

On May 9, 2016, plaintiff saw Dr. Ehrlich for follow-up for headaches.  (Tr. 341-345, 491-496).  Britton had occasional headaches, with some radiation of pain into the neck.  *Id.*  Ehrlich diagnosed post-concussion syndrome and cervicalgia.  *Id.*  He stated that she still was unable to work.  *Id.*

On May 10, 2016, plaintiff was seen by Richard Ballard, M.D., for her right knee injury.  (Tr. 338-340, 488-490).  Britton described her pain as a 9/10, and very painful throughout the day.  *Id.*  She experienced swelling on her knee, especially when she had been on it all day.  *Id.*  Upon examination, the knee was very stiff, with no greater than 70 degrees flexion.  *Id.*  She had swelling, and certainly inflammatory tenosynovitis.  *Id.*  However, Ballard did not observe any instability at all.  *Id.*  He diagnosed degenerative arthritis of the knee, placed her on Indocin, and instructed her to return in four weeks.  *Id.*

On May 20, 2016, plaintiff returned to Dr. Ehrlich for follow-up.  (Tr. 357-361, 529-532).  Ehrlich noted that Britton was there that day for her back and leg pain.  *Id.*  Dr. Ballard had given her an injection in the right knee that had helped, and she was scheduled to receive another injection.  *Id.*  An MRI of the lumbar spine showed spondylosis of levels L2 and lower and slight bulging discs, but nothing herniated or surgical.  *Id.*  She had a normal gait and stance.  *Id.*  Ehrlich diagnosed knee joint pain, orthopedic disorders of the spine, backache, and limb pain.  *Id.*  She was to return in one month.  *Id.*

On May 24, 2016, plaintiff saw nurse practitioner, Robert Garrett.  (Tr. 353-356, 484-487).

8

Britton reported sharp, nagging pain since January 2016, that she described as an 8/10 that was worse during the day. *Id.* An injection had helped. *Id.* Her knee pain slowly worsened with extended activity. *Id.* She had intermittent right knee swelling, and right knee stiffness. *Id.* Pain was elicited on the extreme limits of the range of motion of her right knee. *Id.* A McMurray test was positive. *Id.* However, there was no swelling, crepitus, or instability. *Id.* An MRI of the left knee showed moderate chondromalacia. *Id.* Garrett assessed osteoarthritis of the right knee. *Id.* Britton elected to continue Indocin and to give physical therapy a chance. *Id.*

On June 5, 2016, non-examining agency physician, Craig Billinghurst, M.D., reviewed the record and completing a physical residual functional capacity assessment whereby he essentially opined that plaintiff retained the residual functional capacity for light work. (Tr. 91-92).

On June 6, 2016, plaintiff returned to Dr. Ehrlich for prescription refill. (Tr. 351-352, 477-478). Britton was taking medication for joint pain, which seemed to help. *Id.* Ehrlich diagnosed lumbago and cervicalgia. *Id.*

On June 9, 2016, plaintiff returned to Dr. Ehrlich for follow-up for headaches/back pain. (Tr. 333-337, 448-452). Britton reported that her headaches were getting better with only ten for the month of May 2016. *Id.* Her muscle tone and strength were normal. *Id.* Ehrlich diagnosed headache and cervicalgia. *Id.*

On June 11, 2016, plaintiff saw Dr. Ehrlich for back pain follow-up. (Tr. 328-332, 468-472). Britton reported that she could not stand long or bend over without pain. *Id.* EMG and nerve conduction studies were pending. *Id.* She ambulated with a cane, and was taking Tramadol for pain, as well as Indomethacin. *Id.* Upon examination, her sensory examination was intact, with normal muscle tone and strength. *Id.* Ehrlich diagnosed orthopedic disorders of the spine, and backache. *Id.* He indicated that she was unable to work. *Id.*

On June 23, 2016, plaintiff returned to Dr. Ballard for a recheck of her right knee. (Tr. 325-327, 465-467). Plaintiff's pain was better -- dull, aching, which she characterized as a 9/10. *Id.* Her

9

pain was worse when she used her knee.  *Id.*  She was getting a bit better with current medication, but the more she used the knee, the more it bothered her.  *Id.*  Ballard diagnosed knee strain, and post-traumatic tendinitis.  *Id.*  She was to continue physical therapy, take her medication as ordered, and return in six weeks.  *Id.*

On July 26, 2016, plaintiff returned to Dr. Ehrlich for her back pain.  (Tr. 460-464).  She continued to have severe low back pain and severe right knee pain.  *Id.*  She had been sent to obtain second opinions with Drs. Brown and Grier.  *Id.*  She also had had an EMG done.  *Id.*  Ehrlich believed that Dr. Ballard had recommended right knee surgery, but he admitted that he could be wrong.  *Id.*  Britton continued on pain medication at least three to four times per day.  *Id.*  Ehrlich noted an ataxic gait.  *Id.*  He diagnosed backache and limb pain.  *Id.*  He stated that she was unable to work in any capacity at this time because of two workers' compensation injuries.  *Id.*

On July 30, 2016, plaintiff returned to Dr. Ehrlich for follow-up for her neck and head.  (Tr. 436-440).  Her headaches occurred about five times per week, and her neck pain was daily.  *Id.*

On August 4, 2016, plaintiff saw Dr. Ballard to re-check her right knee pain.  (Tr. 533-534).  She reported sharp, throbbing, aching pain that seemed to come and go.  *Id.*  When she bent her knee, she experienced discomfort.  *Id.*  Pain often kept her up at night.  *Id.*  Ballard believed that she "just" had degenerative arthritis.  *Id.*  He added that "[a]t this point, I am just going to keep her on her Indocin." *Id*.  She could return, if she felt it was necessary.  *Id.*

On August 27, 2016, plaintiff returned to Dr. Ehrlich for follow-up for head/neck pain.  (Tr. 431-434).  Ehrlich indicated that plaintiff's head and neck pain was slowly and slightly improving. *Id.*  Since he last saw her, Dr. Ballard had placed her in a right knee brace, and she was ambulating with a cane.  *Id.*  Ehrlich stated that she was unable to work at that time, but she was improving in this regard.  *Id.*

On August 29, 2016, plaintiff saw Dr. Ehrlich for follow-up for her back.  (Tr. 453-457).  She reported that her back pain was worse in the morning.  *Id.*  Her gait and stance were normal.  *Id.*

10

Ehrlich indicated that she was unable to work at that time.  *Id.*

On September 8, 2016, plaintiff returned to Dr. Ballard for recheck.  (Tr. 445-447).  Her chief complaint was right knee pain.  *Id.*  She was having less pain while taking Indomethacin.  *Id.*  Her brace helped to support her, and her functioning was improving.  *Id.*  Ballard diagnosed knee strain. *Id.*

A September 15, 2016, bone density test showed that plaintiff had osteopenia.  (Tr. 512-515).

On September 26, 2016, plaintiff returned to Dr. Ehrlich for head and neck complaints.  (Tr. 373-376, 441-444).  Her headaches and neck pain had improved and now were occurring about four days per week.  *Id.*  She had been off work since January because of two different work-related injuries.  *Id.*  She had a normal gait and stance.  *Id.*  Ehrlich diagnosed headache and cervicalgia.  *Id.*

On September 30, 2016, plaintiff returned to Dr. Ehrlich for her back/knee pain.  (Tr. 377-380).  Ehrlich diagnosed orthopedic disorders of the spine, backache, and chronic pain syndrome.  *Id.* He made a second request for workers' compensation to approve physical therapy for low back pain stemming from a work-related injury.  *Id.*

A September 30, 2016, MRI of the lumbar spine showed mild spondylosis L2 through S1, with slight annular bulging, but nothing surgical.  (Tr. 324).

On September 30, 2016, plaintiff returned to Dr. Ehrlich for follow-up for her back/knee. (Tr. 416-419).  He noted that Britton had an ataxic gait.  *Id.*

On October 10, 2016, plaintiff saw Dr. Ballard for re-check for her right knee pain.  (Tr. 413-415).  She reported sharp stabbing pains that came and went.  *Id.*  However, she had no swelling, and was able to bend the knee without any pain.  *Id.*  She was doing a bit better as far as her knee was concerned.  *Id.*  Ballard diagnosed inflammatory arthritis of the knee and osteopenia.  *Id.*  He encouraged her to be as active as possible.  *Id.*

On October 24, 2016, plaintiff returned to Dr. Ehrlich for follow-up for her neck/head.  (Tr. 427-430).  She experienced headaches about ten times per week and daily neck pain that was getting

11

better.  *Id.*  Her gait and stance were normal.  *Id.*

On October 28, 2016, plaintiff saw Dr. Ehrlich for follow-up of her back.  (Tr. 423-426).  She experienced continuous low back pain, without improvement.  *Id.*  However, her gait and stance were normal.  *Id.*  Ehrlich opined that she was unable to work in any capacity at that time because of low back pain.  *Id.*

On November 10, 2016, plaintiff returned to NP Robert Garrett for a right knee pain recheck. (Tr. 420-422).  Britton reported daily pain, but had good days and bad days.  *Id.*  She did not undergo physical therapy as previously prescribed because no one had contacted her.  *Id.*

On November 28, 2016, plaintiff was seen by Dr. Ehrlich for follow-up for her head/neck. (Tr. 409-412).  There was no real change to her headaches and neck pain.  *Id.*  Her gait and stance were normal.  *Id.*  Ehrlich diagnosed headache and cervicalgia.  *Id.*

On December 2, 2016, plaintiff saw Dr. Ehrlich for follow-up for her back.  (Tr. 404-408). She had just started a six week course of physical therapy, three times per week for back pain.  *Id.* Her gait and station were normal.  *Id.*  Ehrlich indicated that she suffered from backache, and that she was unable to work at that time.  *Id.*  Depending on how she did with physical therapy, next up would be pain management with epidural steroids.  *Id.*

On December 8, 2016, plaintiff returned to Dr. Ballard for her right knee pain.  (Tr. 401-403). She had sharp pain in the knee that she described as an 8/10, but with no swelling or bruising.  *Id.*  It was very hard for her to bend over, because she would fall.  *Id.*  She seemed to have post-traumatic tenosynovitis.  *Id.*  Ballard did not think that she needed any surgical intervention; she just had post-traumatic tenosynovitis.  *Id.*

On December 12, 2016, plaintiff returned to Dr. Ehrlich for follow-up for her head and neck. (Tr. 393-396).  He again stated that she was unable to work.  *Id.*

On January 9, 2017, plaintiff saw NP Robert Garrett for recheck for pain in her right knee. (Tr. 397-400).  Plaintiff's pain was an 8/10.  *Id.*  She stated that her knee gave way.  *Id.*

12

On January 20, 2017, plaintiff returned to Dr. Ehrlich for her low back pain. (Tr. 389-392). Ehrlich diagnosed orthopedic disorders of the spine, backache, limb pain, and chronic pain syndrome. *Id.*

On January 23, 2017, plaintiff again saw Dr. Ehrlich for her neck and head pain. (Tr. 385-388). She had an ataxic gait. *Id.* Ehrlich diagnosed headache and cervicalgia. *Id.*

On March 16, 2017, plaintiff was discharged from physical therapy. (Tr. 382-384). The treatment notes reflect that she had complaints to her right knee and low back. *Id.* Her knee was her chief complaint. *Id.* She reported that the knee gave out on her when she was walking, standing, or trying to sit down. *Id.* She also had low back pain from the fall. *Id.* Her pain was an 8/10 at its worst, and 5/10 at its best. *Id.* It was aggravated by standing, sitting, and walking. *Id.* She ambulated with increased postural guarding. *Id.*

On June 22, 2017, Dr. Ehrlich wrote a To Whom it May Concern letter in which he stated that he was plaintiff's treating neurologist. (Tr. 541). He explained that plaintiff continued to have headaches and neck pain that rendered her disabled and unable to work at that time. *Id.* She continued with her medication treatment. *Id.*

On August 22, 2017, Dr. Ballard penned a note in whereby he documented that he had been following Britton for right knee problems for over one year. (Tr. 542). He added that Britton continued to experience pain and locking of her knee. *Id.* She was scheduled for operative intervention in the near future. *Id.*

b) Discussion

In her decision, the ALJ reviewed the available evidence, including the hearing testimony, the medical treatment history, and the findings of the treating, consultative, and non-examining physicians, plus the nurse practitioner(s). (Tr. 57-60). In deriving plaintiff's RFC, the ALJ resolved the opinion evidence by assigning "some" weight to the findings of Drs. Varnado and Billinghurst, but "little" weight to the impressions and statements of NP Michael Brown and Dr. Ehrlich. *Id.* In

13

short, the ALJ credited the impression of the consultative physician, together with the more-detailed assessment of the non-examining agency physician, in lieu of the limitations recognized by a nurse practitioner and the conclusory statement that plaintiff was unable to work offered by her treating neurologist.[4]  Understandably, plaintiff, for various reasons, cries foul.

First, plaintiff contends that the ALJ failed to comply with Social Security Ruling 96-8p and *Myers v. Apfel*, 238 F.3d 617, 620–621 (5th Cir.2001), which specify, *inter alia*, that the RFC must be a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.  TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, SSR 96-8P (JULY 2, 1996) ("SSR 96-8p").  Here, however, the ALJ based her decision, in no small part, upon the medical reports of the consultative and agency physicians, which contained a general evaluation of plaintiff's impairments, and, at least in the latter report, a function-by-function analysis of the limitations imposed by those impairments.  These medical reports, when combined with the ALJ's appraisal of the testimony and the remainder of the record satisfies the requirements of SSR 96-8p, and its associated regulations.  *Beck v. Barnhart*, 205 Fed. Appx. 207, 214 (5th Cir.2006) (citation omitted); *Onishea v. Barnhart*, 116 Fed. Appx. 1, 2 (5th Cir.2004).

Plaintiff further argues that the ALJ failed to properly address her standing and walking limitations.  However, plaintiff underwent a consultative examination with Dr. Varnado who concluded that she ambulated with difficulty and that she used a helpful, but not required, assistive device.  (Tr. 319).  However, Dr. Varnado did not include any specific limitations regarding plaintiff's ability to stand or walk.  Moreover, the agency physician, Dr. Billinghurst, reviewed Dr. Varnado's report, together with other evidence in the administrative file at the time, and opined that

---

[4] Dr. Ehrlich's repeated statements that the claimant was "disabled" or "unable to work" is not accorded any special significance under the regulations.  *See* 20 C.F.R. § 404.1527(d)(1)-(3); *Frank v. Barnhart*, 326 F.3d 618 (5th Cir. 2003).

she was able to stand and/or walk with normal breaks for a total of six hours in an eight hour workday.  (Tr. 91).

Of course, plaintiff argues that additional, significant medical evidence was added to her file after Dr. Billinghurst issued his opinion, and therefore, his findings were outdated and cannot provide substantial evidence to support the ALJ's findings.   While the court agrees that a considerable amount of plaintiff's treatment notes were not admitted to the record until later, the court is not persuaded that they necessarily undermine the basis for Dr. Billinghurst's opinion.  For example, plaintiff noted several instances where Dr. Ehrlich documented that she had an ataxic gait.  At other times, however, plaintiff had a normal gait and stance.  *See e.g.*, Tr. 453-457, 357-361, 328-332, 373-376.  In fact, Ehrlich also documented that Britton's muscle tone and strength were normal.  *See e.g.,* 333-337, 328-332.

Plaintiff further emphasizes Dr. Ballard's May 10, 2016, examination which found her right knee to be very stiff and swollen.  However, Ballard did not observe any instability in the knee at all.  (Tr. 338-340).  Moreover, just two weeks later, not only was there no instability, there was no swelling or crepitus either.  (Tr. 353-356).  By August 2016, Ballard believed that Britton "just" had degenerative arthritis, and that she could return to see him, basically, as needed.  (Tr. 533-534). When plaintiff returned in September, Ballard noted that plaintiff's functioning was improving, a brace was helping her, and that she had a knee strain.  (Tr. 445-447).  In October 2016, plaintiff had no swelling of her knee, and was able to bend the knee without pain.  (Tr. 413-415).  Rather than restricting plaintiff's activities, Ballard encouraged her to be as active as possible.  *Id*.  In December 2016, Dr. Ballard again observed no swelling or bruising.  (Tr. 401-403).  He concluded that plaintiff's condition did not require surgical intervention.  *Id*.[5]

---

[5] Clearly by August 2017 something had changed, because by then, Dr. Ballard had scheduled plaintiff for knee surgery.  The reason for this change, however, is not reflected in the medical treatment record.

Plaintiff also argues that the ALJ erred by failing to credit the impression of nurse practitioner Michael Brown who significantly limited plaintiff's ability to work in January 2016, shortly after she injured her knee at work. *See* Tr. 249-250. However, the ALJ discounted the significance of NP Brown's impressions because under the regulations then in effect, a nurse practitioner was not an acceptable medical source.[6] (Tr. 59-60). She also added, *inter alia*, that the limitations were not supported by sufficient explanation. *Id.*

Under the SSA regulations, only "acceptable medical sources" can provide "medical opinions" to show the severity of a claimant's impairment and how it affects his or her functional ability. 20 C.F.R. § 1527(a)(2) & 416.927(a)(2). Although the ALJ is required to consider evidence from "other" sources, "the fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because, . . . 'acceptable medical sources' 'are the most qualified health care professionals.'" SSR 06-03p; *see also Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991) (recognizing that the regulations accord less weight to other sources such as chiropractors than to medical doctors); *Reynolds v. Astrue*, 2010 WL 583918 (N.D. Miss. Feb. 16, 2010) (observing that nurse practitioner is not afforded the same level of deference as a physician). Here, the ALJ complied with SSR 06-03p.

Finally, plaintiff contends that the reasons proffered by the ALJ to reject her subjective description of symptoms are not supported by the record.[7] When assessing disability, the ALJ is

---

[6] In September 2016, the regulations were expanded to include Licensed Advanced Practice Registered Nurses or other licensed advanced practice nurses as acceptable medical sources. *See* 81 Fed. Reg. 62560, 62568 (Sept. 9, 2016). The change, however, is effective only for claims filed on or after March 27, 2017.

[7] Previously, plaintiff's argument would have been characterized as a challenge to the ALJ's credibility determination. However, in 2016-2017, the Commissioner issued a new social security ruling that dispensed with the term "credibility" because it was not used in the regulations. *See* Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P

16

required to consider all symptoms, including pain, and the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence, together with other evidence.  20 C.F.R. § 404.1529(a).  In evaluating the intensity of symptoms, including pain, the ALJ will consider all available evidence such as medical history, medical signs and laboratory findings, and statements about how the symptoms affect the claimant.  *Id*.  The ALJ also must consider inconsistencies in the evidence and conflicts between the claimant's statements and the remainder of the evidence.  20 C.F.R. § 404.1529(c)(4).  However, the ALJ need not follow formalistic rules in her assessment.  *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).

Relatedly, pain is considered disabling under the Social Security Act only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment."  *Selders v. Sullivan*, 914 F.2d 614, 618-619 (5th Cir. 1990).  The ALJ's decision regarding the actual extent of plaintiff's complaints of pain is entitled to considerable judicial deference if supported by substantial evidence. *James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986); *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991).  Factors that the ALJ may consider in evaluating the claimant's subjective complaints include: (1) claimant's daily activities; *Falco v. Shalala*, 27 F.3d 160 (5th Cir. 1994); *Anthony v. Sullivan*, 954 F.2d 289, 296 (5th Cir. 1992); *Reyes v. Sullivan*, 915 F.2d, 151, 155 (5th Cir. 1990); (2) medication the claimant takes for pain; *Anthony v. Sullivan, supra; Villa v. Sullivan,* 895 F.2d 1019, 1024 (5th Cir. 1990); (3) degree of medical treatment; *Villa, supra; Nickerson v. Secretary of Health and Human Services*, 894 F. Supp. 279 (E.D. Tex. 8/3/1995); (4) lack of medical opinions in the record indicating the claimant is precluded from performing the level of activity indicated by the ALJ; *Villa, supra;* and (5) external manifestations of debilitating pain such as marked weight loss.  *Falco, supra*; *see also* 20 C.F.R.§§ 404.1529(c)(3)(i)-(vii).

---

(OCT. 25, 2017).

17

The ALJ complied with the foregoing requirements in this case.  She dutifully recounted the hearing testimony provided by plaintiff.  (Tr. 58).  Ultimately, however, she determined that plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record for reasons set forth in the decision.  *Id.*      For example, she noted that plaintiff's description of her activities of daily living that she reported to Dr. Varnado were inconsistent with the limitations that she detailed at the hearing (well after her examination with Dr. Varnado) as well as those she listed in her disability function report (completed just two months before her examination).  (Tr. 58).  It is also worth noting that in her disability function report, plaintiff stated that she danced and exercised every day, but could not "do some sit up[s] or *too much* dancing because [her] back & knee injury."  (Tr. 193) (emphasis added).

The ALJ also remarked that plaintiff's professed limitations were inconsistent with the examination findings of Dr. Varnado, which, of course, the ALJ ultimately credited.  In addition, the ALJ emphasized that plaintiff received only conservative treatment options, including physical therapy and medication (NSAIDs) for her medication.  (Tr. 59).  Although the ALJ acknowledged that plaintiff eventually was scheduled to undergo "operative intervention" of the right knee, she observed that the "objective" evidence failed to demonstrate that her impairments impeded her ability to perform basic work activities.  (Tr. 59).[8]  Indeed, if, as plaintiff often reported to her doctors, that her pain was an eight or nine on a ten point scale, i.e. of the utmost severity and intensity, it stands to reason that she would have sought and received more significant medical intervention than what the record currently reflects.

In sum, the court finds that the ALJ's assessment of plaintiff's subjective complaints and symptoms satisfied the requirements of 20 C.F.R. § 404.1529, and is supported by substantial

---

[8] Again, Dr. Ballard did not assign any limitations of functioning.

evidence.  *See Giles v. Astrue*, 433 Fed. Appx. 241, 249 (5th Cir.2011) (ALJ's appraisal of plaintiff's subjective complaints is supported by his discussion of medical records and opinions); *Herrera v. Comm'r of Soc. Sec.*, 406 Fed. Appx. 899, 905–06 (5th Cir.2010) (ALJ complied with SSR 96-7p [now SSR 16-3p] by thorough consideration and discussion of the relevant medical evidence); *Undheim v. Barnhart*, 214 Fed. Appx. 448 (5th Cir. 2007) (opinion as a whole gave sufficient reasons and documentation for the ALJ's resolution of subjective evidence); *Cornett v. Astrue*, 261 Fed. Appx. 644 (5th Cir. 2008) (ALJ gave some weight to claimant's complaints; thus claimant's arguments that his subjective complaints were not given enough weight is unavailing); *Hernandez v. Astrue*, 278 Fed. Appx. 333 (5th Cir. 2008) (despite claimant's subjective allegations of pain, the ALJ gave "greatest weight" to treating physician's opinion).

## II.        Step Four

Essentially re-urging the same arguments that she employed to challenge the sufficiency of the ALJ's residual functional capacity assessment, plaintiff contends that the ALJ's step four conclusion is flawed.  However, the ALJ employed a vocational expert to assist her with her step four determination and posed hypothetical(s) that contemplated plaintiff's past occupation and RFC.  It is manifest that a hypothetical need only reasonably incorporate the disabilities and limitations recognized by the ALJ.  *Bowling v. Shalala*, 36 F.3d 431 (5th Cir. 1994).  Here, the ALJ's hypothetical(s) to the vocational expert substantially incorporated the limitations recognized in her residual functional capacity assessment, and that assessment is supported by substantial evidence.  *See* discussion, *supra*.  In any event, an ALJ's hypothetical is not defective when, as in this case, the claimant is afforded an adequate opportunity to correct any real or asserted deficiencies in the ALJ's question.  *Hardman v. Colvin*, 820 F.3d 142, 149 (5th Cir.2016) (citations omitted).

## <u>Conclusion</u>

The ALJ in this case was tasked with determining whether plaintiff was disabled.  In so

doing, she considered the claimant's testimony, the medical record, and expert opinion evidence. The evidence by no means was uniform and could have supported a different outcome. Such conflicts in the evidence, however, are for the Commissioner to resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted). This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton v. Apfel,* 209 F.3d 448, 459 (5th Cir. 2000).[9] That is not to say that the Commissioner's decision necessarily is blemish-free, but procedural perfection in the administrative process is not required, and any errors do not undermine confidence in the decision. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988).[10]

For the foregoing reasons, the undersigned finds that the Commissioner's determination that the claimant is not disabled under the Social Security Act, is supported by substantial evidence and remains free of legal error. Accordingly,

IT IS RECOMMENDED that the Commissioner's decision be AFFIRMED, in its entirety, and that this civil action be DISMISSED with prejudice.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within

---

[9] Generally, courts "only may affirm an agency decision on the basis of the rationale it advanced below." *January v. Astrue,* 400 Fed. Appx. 929 (5th Cir.2010) (citation omitted). One exception to this rule, however, is harmless error, i.e. absent the alleged error or omission, there is "no realistic possibility" that the ALJ would have reached a different result. *Id.* This exception is applicable here.

[10] Procedural improprieties "constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen,* 864 F.2d 333, 334 (5th Cir. 2007).

**fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 31st day of October 2019.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE